IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SUZANNE CHRISTIAN | : | |
| v. | : | Civil Action No. DKC 98-3371 |
| MINNESOTA MINING &<br>MANUFACTURING COMPANY | : | |

JAN - 9 2001

CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY                    DEPUTY

| | | |
|---|---|---|
| JOAN HARRIS | : | |
| v. | : | Civil Action No. S 97-3107 |
| MINNESOTA MINING &<br>MANUFACTURING COMPANY | : | |

| | | |
|---|---|---|
| MARY BYWATER | : | |
| v. | : | Civil Action No. AW 97-3887 |
| MINNESOTA MINING &<br>MANUFACTURING COMPANY | : | |

| | | |
|---|---|---|
| BRENDA STRICKLAND | : | |
| v. | : | Civil Action No. PJM 97-3791 |
| MINNESOTA MINING &<br>MANUFACTURING COMPANY | : | |

## MEMORANDUM OPINION

These products liability actions brought by Suzanne Christian, Joan Harris, Mary Bywater, and Brenda Strickland ("Plaintiffs"), against Minnesota Mining & Manufacturing Company ("3M")[1] have been consolidated for resolution of 3M's pending motion for summary judgment. The issues have been fully briefed, and no hearing is

---

[1] Plaintiffs' claims against all other Defendants were dismissed on January 10, 2000. See Paper No. 12.

deemed necessary.  Local Rule 105.6.  For the following reasons,
the court shall GRANT Defendant's motion for summary judgment.

## I.  **Background**

These cases involve silicone breast implants.[2]  Donald McGhan
an engineer, and some of his colleagues incorporated McGhan Medical
Corporation ("McGhan I") on November 20, 1974 for the express goal
of marketing silicone breast implants.  In June of 1977, 3M
acquired all assets of McGhan I and transferred them to a newly
created subsidiary of 3M, also named McGhan Medical Corporation
("McGhan II").  In 1980, 3M merged McGhan II with its existing
Surgical Products Division.

While 3M manufactured and sold breast implants, it became
aware of problems patients experienced stemming from the products.
Often, the implants increased patient risks for capsular
contracture (formation of scar tissue through fibrosis), gel bleed

---

[2]These are a subset of the hundreds of breast implant cases
consolidated for pretrial management and administration and at
least the sixth time the liability of 3M has been resolved.  In the
first, *Felker v. McGhan Medical Corp. (In re Minnesota Breast
Implant Litig.)*, 36 F.Supp.2d 863 (D.Minn. 1998), the United States
District Court for the District of Minnesota confronted issues
identical to the ones currently before this court. The undersigned
is very grateful for the thorough analysis provided by Chief Judge
Magnuson and relies heavily on it in the disposition of this case.
*See also,* Defendant's Exhibit 1, *McConkey and McKonkey v. McGhan
Medical Corp., et. al.,* No. 3:98-CV-003 (E.D. Tenn. June 6, 2000);
Defendant's Exhibit 2, *Almonte, et. al. v. Minn., Mining, & Manf.
Co.,* No. 97-0613ML et.al., (D.R.I., September 25, 2000);
Plaintiffs' Exhibit 43, *Beck vs. McGhan Medical Corp., et. al,* No.
9211-07793, (Cir. Ct. of Or., March 1, 1994); Defendant's
Supplemental Exhibit A, *Healy v. McGhan Medical Corporation, et.
al.,* No. 97-5320 (Mass. Super. Ct., December 26, 2000).

(liquid silicone leaking outside of the intact shell of the implant), silent rupture (rupture which is not immediately detected), migration of leaked silicone away from the breasts, and inflammation. 3M also found itself the defendant in several lawsuits because of alleged problems with the implants. In 1984, anticipating future tort liability, 3M sold its silicone breast implant product line.

Founders of McGhan I in combination with other investors bought 3M's product line and formed McGhan Medical Corporation ("McGhan III"). McGhan III paid $5.5 million for 3M's breast implant business. However, $2.75 million of this purchase price was paid by promissory note, payable within three years of closing. At the time of divestiture, 3M also issued a press release to the general public stating, "[t]he business was sold because it was not consistent with the Division's future growth targets . . . We feel the new owners have the ability to continue 3M's strong quality orientation and service support to the business." Plaintiffs' Ex. 34.

Additionally, as a part of the purchase agreement, 3M agreed to provide transitional services consisting of sterilization, managerial, and computer services. 3M also became McGhan's landlord because it retained the leasehold on the property where the implants were manufactured. Even though 3M provided transitional services and leased McGhan III facilities, McGhan III

3

operated the breast implant business on its own.  3M and McGhan III had separate corporate identities with distinct officers, directors, and employees.

Shortly thereafter, in 1985, McGhan III became a wholly-owned subsidiary of First American Corporation (later renamed "INAMED"), a publicly-held corporation.  INAMED defaulted on the loan it had acquired through its purchase of McGhan III.  3M initially agreed to restructure the loan, but subsequently threatened INAMED with litigation when it again defaulted on the loan.

Plaintiffs underwent breast implant surgery at different times between 1988 and 1992.  The implants in each situation were manufactured, shipped, and sold by McGhan III.  It is undisputed that the implants used in each of the four surgeries were manufactured by McGhan III long after 3M's 1984 divestiture.

## II. **Summary Judgment Standard**

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be

4

resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party. *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 437 (4th Cir. 1998). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256.

5

In *Celotex*, the Supreme Court stated:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex*, 477 U.S. at 324. However, "'a mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III. **Analysis**

The record clearly reflects that McGhan III manufactured and sold breast implants to Plaintiffs. In fact, Plaintiffs do not contest this point. Rather, they assert that 3M possessed an

6

unlawful objective in transferring its breast implants product line

to McGhan III, an allegedly sham corporation.[3]  Plaintiffs contend

that McGhan III shielded 3M from liability while allowing it to

reap profits from the sales of breast implants.  To support this

assertion, Plaintiffs point to the facts that 3M served as landlord

of the property, accepted promissory notes as payment, and provided

transitional services to McGhan III, as evidence of 3M's control.

However, 3M and McGhan III were independent companies with

separate officers, directors, and employees.  Moreover, any control

3M exerted over McGhan III promptly ended in 1985, when INAMED, a

publicly-traded corporation, purchased McGhan III.  In fact, at the

time each of the plaintiffs' McGhan III breast implants were sold,

McGhan III was a wholly-owned subsidiary of INAMED.  Plaintiffs

specifically point out that Donald McGhan served as the ultimate

decisionmaker at INAMED.  However, even assuming McGhan's influence

at INAMED, the record does not contain any evidence to substantiate

the idea that 3M controlled Donald McGhan.  Because Plaintiffs have

not established that 3M exerted any control over Donald McGhan,

---

[3]Plaintiffs claim that McGhan III was woefully underfunded precisely so that 3M could avoid liability.  However, at the time Plaintiffs received their breast implants, McGhan III had become a subsidiary of INAMED a publicly-owned company with assets of over $13 million in 1988, nearly $26 million in 1990, $25 million in 1991, and $29 million in 1992.  *See* Paper No. 22, *Reiskin Moving Aff.*, Exhibits 15-18.

they are unable to demonstrate that 3M managed operations for either INAMED or McGhan III.

Although McGhan III occupied the same office space and factory space vacated by 3M upon the sale of the business, there is no evidence that this reflected 3M's control over McGhan III. Additionally, Plaintiffs have not provided any authority to establish that 3M is liable simply because McGhan III occupied 3M's former office and factory space.

Furthermore, Plaintiffs argue that 3M's acceptance of promissory notes and loan of money to McGhan III suffices as evidence to impose liability on 3M for the actions and products of McGhan III. To the contrary, a creditor does not incur liability from a borrower's actions due simply to its creditor status. *See Athey Prods. Corp. v. Harris Bank Roselle,* 89 F.3d 430, 435 (7th Cir. 1996)(lending money in accordance with a loan agreement is insufficient to create a legal duty for the lender to make disclosures about the borrower); *Hazeltine Corp. v. General Elec. Co.,* 19 F.Supp. 898, 903 (D. Md. 1937)(lending of money even in large amounts by one corporation to another does not alone make lender liable for acts of the borrower). Additionally, there is no evidence that 3M forgave the debt owed by McGhan III. In fact

quite to the contrary, 3M threatened to sue INAMED, after the company repeatedly defaulted on the loan.

Moreover, Plaintiffs highlight the managerial, sterilization, and computer services provided by 3M to McGhan III as evidence of 3M's control.    These   transition   services   did   not   extend indefinitely.[4]   In fact, any services provided by 3M ceased long before McGhan III manufactured and sold the breast implants Plaintiffs received.    Thus, there is no evidence supporting the notion 3M controlled McGhan III and consequently, should be found liable for McGhan III's actions and products.

Having concluded that 3M and McGhan III are not different names for the same company but rather distinct corporate entities, the court will now analyze each of the Plaintiff's claims[5]  within

---

[4]Plaintiffs' also contend that further evidence of 3M's control over McGhan III was the fact that 3M continued to buy raw materials from McGhan III.    However, the raw materials were unrelated to the manufacture of breast implants as 3M had divested its line to McGhan III.    Additionally, 3M European subsidiaries continued to distribute breast implants.    Since none of the Plaintiffs' breast implants were manufactured by 3M, not even a 3M European subsidiary, this is simply not relevant to the case at hand.

[5] Plaintiffs do not oppose summary judgment on their claims for breach of warranty, breach of the UCC and applicable state law counterparts, negligence per se, false advertising, fraudulent concealment, res ipsa loquitur, common plan to prevent public awareness, market share, negligent infliction of emotional distress, fear of future product failure, participation in, or supervision of, joint ventures and/or parent/subsidiary
(continued...)

9

the context of Maryland law, which all parties agree applies. Plaintiffs assert numerous claims in their respective Complaints and in the First Amended Master Complaint.[6]

## A. Strict Products Liability

Plaintiffs are alleging that 3M should be found strictly liable for the injuries they suffered from their McGhan III-manufactured breast implants, pursuant to §402A of the Restatement (Second) of Torts §402A(1)(1965). *See Phipps v. General Motor Corp.*, 278 Md. 337, 353 363 A.2d 955, 963 (1976) (adopting the strict liability principles set forth in the Restatement 402A into Maryland law). Under traditional products liability law, the plaintiff must establish that the defendant is somehow liable for the injury caused by the challenged product. *See Linda Lee v. Baxter Healthcare Corp.*, 721 F.Supp. 89, 92 (D. Md. 1989) (finding that plaintiff's failure to identify defendant as manufacturer of allegedly defective implant precluded the manufacturer from being

---

[5](...continued)
relationships, invalidity of indemnification agreements, collateral estoppel, and res judicata, the Lanham Act, and the Magnuson-Moss Act. Accordingly, summary judgment on those claims will be entered in favor of Defendant.

[6]The First Amended Complaint was filed in *In re: Silicone Gel Breast Implant Products Liability Litigation (MDL-926)*, before the Honorable Sam C. Pointer, Jr. of the United States District Court for the Northern District of Alabama, Southern Division.

liable); *see also Tidler v. Eli Lilly & Co.,* 851 F.2d 418, 424
(D.C. Cir. 1988)(federal court applying Maryland law refused to
adopt non-identification theories of product liability because such
theories had not been recognized by Maryland courts).    Thus,
Plaintiffs must prove that Defendant actually manufactured or
distributed the product which purportedly caused the plaintiff's
injury.

Plaintiffs do not dispute that McGhan III manufactured and
sold their implants.    Each Plaintiff received her implants long
after 3M had divested its breast implant line to McGhan III.    Thus,
if 3M played no role in the manufacture or the sale of Plaintiffs'
breast implants, 3M cannot be strictly liable.    Accordingly,
Plaintiffs' strict liability claims against 3M must fail.

### B. Negligence

In Maryland, a plaintiff asserting a negligence claim must
establish that (1) the defendant owed the plaintiff a duty; (2) the
defendant breached that duty; and (3) the breach proximately caused
the plaintiff's injury.    *See Rosenblatt v. Exxon,* 335 Md. 58, 76,
642 A.2d 180, 188 (1994); *Lamb v. Hopkins,* 303 Md. 236, 241, 492
A.2d 1297, 1300 (1985).    Plaintiffs must establish that 3M owed
them a duty.    They allege that because 3M controlled McGhan III,
and McGhan III owed them a duty, 3M owed Plaintiffs a duty.    Under

11

Maryland law, however, one manufacturer is not to be held liable for the product of another. *See Foster v. American Home Prods. Corp.*, 29 F.3d 165, 167 (4th Cir. 1994) (granting summary judgment in favor of the manufacturer because the company did not produce the allegedly defective product). Thus, there is no duty of care owed if the manufacturer did not produce the allegedly defective product.

It is undisputed that the breast implants at issue caused the Plaintiffs' alleged injuries and that they were manufactured and sold to Plaintiffs by McGhan III. However, Plaintiffs contend that 3M should still be held liable for McGhan III's negligence, because McGhan III was just a sham corporation. As discussed above, Plaintiffs have been unable to provide evidentiary support for this proposition. Accordingly, Plaintiffs' negligence actions against 3M also fail.

### C. Failure to Warn

"A failure to warn claim, under either negligence or strict liability, requires the following elements: (1) that the defendant owed a duty to warn; (2) that the defendant breached that duty; (3) that there was a direct causal connection between the defendant's failure and the alleged injuries; and (4) that the plaintiff was harmed." *Higgins v. Diversey Corp.*, 998 F.Supp. 598, 604 (D. Md.

1997). Plaintiffs cannot establish the first prong of the failure to warn claim, that 3M owed them a duty. In fact, 3M did not owe Plaintiffs a duty to warn because the company neither manufactured or supplied Plaintiffs' breast implants.

Plaintiffs also contend that the duty to warn should nevertheless be imputed to 3M because it divested the breast implant line fully knowing that this product had dangerous tendencies. However, one manufacturer is generally not held to have a duty to warn about the products produced by another. *See Baughman v. General Motors Corp.*, 780 F.2d 1131, 1132 (4th Cir. 1986)(finding that manufacturer cannot be found to have a duty to warn of the dangers associated with the replacement parts it did not manufacture). Accordingly, a manufacturer which sells its business owes no duty to warn the users of the products that are manufactured and sold by the purchaser of the manufacturer's operations. *See Fricke v. Owens-Corning Fiberglass Corp.*, 618 So.2d 473, 474 (La. 1993) (finding that predecessor company did not have a duty to warn about a product it no longer produced or sold).

In the case at hand, McGhan III, not 3M, manufactured and sold the breast implants that allegedly caused each of the Plaintiff's injuries. Moreover, by the time McGhan III manufactured the breast implants at issue in this case, INAMED, and not 3M, owned McGhan

13

III.     Thus, 3M did not have a duty to warn these particular
Plaintiffs under either a strict liability or a negligence failure
to warn theory of liability.

### D. Intentional Infliction of Emotional Distress

Plaintiffs allege that 3M is liable for intentional infliction
of emotional distress ("IIED").   "A claim for [IIED] has four
elements:  (1) the conduct must be intentional or reckless; (2) the
conduct must be extreme and outrageous; (3) there must be a casual
connection between the wrongful conduct and the emotional distress;
(4) the emotional distress must be severe."   *Manikhi v. Mass
Transit Admin.,* 360 Md. 333, 366, 758 A.2d 95, 113 (2000)(citation
and internal quotations marks omitted).

As discussed before, 3M had no relationship to the Plaintiffs.
The company neither made nor sold the Plaintiffs' breast implants,
thus, the plaintiffs cannot establish that 3M engaged in extreme or
outrageous conduct towards them.     Moreover, any extreme or
outrageous conduct McGhan III perpetuated cannot be imputed to 3M
because the companies were distinct.     Accordingly, Plaintiffs'
claims for intentional infliction of emotional distress claim
against 3M fails.

14

### E. Civil Conspiracy

In Maryland, a civil conspiracy "is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Alleco Inc. v. Harry & Jeanette Weinberg Foundation, Inc.,* 340 Md. 176, 189, 665 A.2d 1038, 1044-1045 (1995); *see also Robb v. Wancowicz*, 119 Md.App. 531, 546, 705 A.2d 125, 132 (1998)(citations omitted). Furthermore, the plaintiff must establish "a meeting of the minds in an unlawful arrangement." *Electronics Store, Inc. v. Cellco Partnership*, 127 Md.App. 385, 409, 732 A.2d 980, 992 (1999).

Plaintiffs allege that 3M unlawfully agreed with McGhan III to divest the company and avoid liability. There is no evidence in this record that 3M's only priority in finding a buyer for the implants division was to find an underfunded entity. Moreover, 3M is not to be held liable simply because they sold off a division that had enormous potential for liability. 3M continues to be the responsible party for the breast implants it actually made and sold. Plaintiffs also cannot prove that 3M committed tortious conduct with respect to them. Furthermore, as discussed earlier, the transitional services provided by 3M are not enough to contradict the separate corporate identities maintained by the

companies and demonstrate a conspiracy.  Thus, Plaintiffs' claims
for civil conspiracy against 3M fail.

### F. Concert of Action

Maryland law does not recognize a cause of action based upon
the concert of action.  *See Herlihy v. Ply-Gem Industries, Inc.*,
752 F.Supp. 1282, 1290 (D. Md. 1990)(holding that Maryland law does
not recognize a nonidentification theory based on an alleged
concert of action); *Lee,* 721 F.Supp. 89 (D.Md. 1989), *aff'd.* 898
F.2d 146 (4th Cir. 1990)(dismissing plaintiff's concert of action
claim against various breast implant manufacturers because
plaintiff was unable to identify the specific manufacturer of the
breast implant at issue); *Tidler*, 851 F.2d at 418 (finding that
under Maryland law there was no cause of action based on alleged
concert of action).  Therefore, Plaintiffs' claims against 3M based
on a concert of action theory fail.

### G. Aiding and Abetting

"Maryland has expressly recognized aider and abettor tort
liability."  *Alleco,* 340 Md. at 198, 665 A.2d at 1049; *see also*
*Purdum v. Edwards*, 155 Md. 178, 186-187, 141 A.2d 550, 554
(1927)(upholding aider and abettor liability in a deceit action,
and pointing out "[w]hen several participate, they may do so in
different ways at different times, and in unequal proportions.  One

16

may plan, another may procure the men to execute, others may be the
actual instruments in accomplishing the mischief but the legal
blame will rest on all."). To establish a claim for aiding and
abetting, plaintiff must establish, " 1)there is a violation of the
law by the principal; 2)defendant knew about the violation, and 3)
defendant gave substantial assistance or encouragement to the
principal to engage in tortious conduct." *Alleco,* 340 Md. at 186
665 A.2d 1038, 1043 (1995).

In a case with an identical record, a federal district court
in Minnesota provided the following analysis to explain the
granting of summary judgment on Plaintiffs' aider/abettor liability
claims:

> Plaintiffs allege that the wrongful acts
> committed by McGhan III are its concealment of
> the risks and defects associated with breast
> implants, its failure to perform safety tests,
> and its misrepresentation of silicone implants
> to the FDA. Even assuming that these wrongful
> acts occurred, the Court cannot find 3M to be
> an aider/abettor.
>
> Plaintiffs rely on facts involving 3M's
> conduct well before the sale of the breast
> implant division in 1984. For example,
> Plaintiffs discuss the extent of 3M's due
> diligence investigation when it initially
> purchased the division in 1977, 3M's own
> testing of the product while it still owned
> the division, and the extent of 3M's own
> disclosures to the FDA while it still owned
> the division. However, none of these facts

17

has any relevance to whether 3M aided and
abetted McGhan III's alleged tortious
wrongdoing after 1984.

Even assuming that 3M sold the division
knowing that the breast implants were
defective and posed health hazards, Plaintiffs
have inadequate factual support for their
assertion that 3M somehow acted in concert
with McGhan III after the divestiture.
Admittedly, 3M allowed McGhan III to purchase
the implant division on credit, and 3M
reorganized the debt twice following the sale.
However, as this court noted in *In re TMJ
Implants Prods. Liab. Litig.*, 880 F.Supp.
1311, 1319-20 (D. Minn. 1995), aff'd, 113 F.3d
1484 (8th Cir. 1997), the fact that 3M provided
transitional services does not rise to the
level of substantial assistance. Moreover,
none of the services 3M provided to McGhan III
involved the purported wrongful acts committed
by McGhan III."

*Felker,* 36 F.Supp.2d at 877-878. The record in this case is no

stronger. Thus, the court holds that 3M did not aid and abet

McGhan III, and Plaintiffs' claims of aider/abettor liability

against 3M fail.

## H. Fraudulent Misrepresentation

"In Maryland, in order to state a cause of action in fraud or

deceit, a plaintiff must allege facts disclosing (1) that the

defendant made a false representation to the plaintiff; (2) that its

falsity was either known to the defendant or that the representation

was made with reckless indifference as to its truth; (3) that the

18

misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied upon the misrepresentation and had the right to rely on it; and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation." *Alleco Inc.,* 340 Md. at 194-195, 665 A.2d at 1047.

Plaintiffs allege that 3M's press release at the time of divestiture stating 3M's opinion that "We feel the new owners have the ability to continue 3M's strong quality orientation and service support to the business" was a fraudulent misrepresentation because 3M had knowledge of the dangers associated with its products.

The court disagrees. First, 3M's press release was circulated to the general public rather than the more targeted audience of potential consumers or their physicians, thus, countering the notion that 3M created the press release for the express purpose of defrauding Plaintiffs. *See Tischler v. Baltimore Bancorp,* 801 F.Supp. 1493, 1505 (D. Md. 1992)(finding that communicating a negligent misrepresentation through the impersonal medium of a press release to the general public is not the type of direct and personal communication which creates a duty to a particular group of people). Second, the press release did not make a representation on the safety of the breast implants themselves, but rather focused on the sale of the product line to McGhan III. *See Felker,* 36 F.Supp.2d

19

at 879 (finding "that the press release by 3M was akin to statements many companies make in similar situations and, in fact, was probably aimed more at 3M's investors as an explanation for why the implant business was sold."). Third, Plaintiffs are unable to provide evidence that they detrimentally relied on the representations provided within the press release. *See Audio Visual Associates, Inc. v. Sharp Electronics Corp., et. al.,* 210 F.3d 254, 262 (4th Cir. 2000)(dismissing plaintiff's fraudulent misrepresentation claim where plaintiff did not present evidence of reasonable detrimental reliance). Thus, Plaintiffs' claims of fraudulent misrepresentation against 3M must fail.

### J. Fraudulent Conveyance

Plaintiffs insist 3M's allegedly ulterior motive to avoid liability while reaping profits drove the divestiture of its breast implants to McGhan III. Under Maryland law, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors." MD. CODE ANN. COM. LAW II § 15-207 (2000). To bring a claim under this provision, plaintiff must allege both "that a creditor-debtor relationship exists and that the debtor has fraudulently transferred assets." *Dixon v. Bennett,* 72

Md.App. 620, 623 n.2, 531 A.2d 1318, 1320 n.2 (1987), *cert. denied*, 311 Md. 557, 536 A.2d 664 (1988).

As discussed above, McGhan III, not 3M, manufactured the Plaintiffs' breast implants. Thus, no relationship existed or currently exists between Plaintiffs and 3M. Morever, even though 3M admits to being sued prior to the divestiture and acknowledges that the fear of future lawsuits factored into its decision to divest, Plaintiffs have not demonstrated that 3M fraudulently transferred its assets. 3M and McGhan III were separate companies, with distinct boards of directors. Additionally, in its divestiture agreement, 3M did not absolve itself from liability for the breast implants it created or could potentially create. 3M obtained an indemnity agreement only for those implants manufactured and sold by McGhan III. Thus, 3M remained liable for those implants it did manufacture and sell. *See Felker,* 36 F.Supp.2d at 877-878 ("Plaintiffs have not proffered any reliable evidence to indicate that 3M's divestiture of the breast implant business occurred solely for 3M to completely avoid liability for alleged defects in the implants."). Thus, Plaintiffs' claims of fraudulent conveyance against 3M must fail.

## I. Maryland Consumer Protection Act

Plaintiffs allege that 3M's conduct violates the Maryland Consumer Protection Act, Commercial Law §13-101, et seq. (1999) which prohibits unfair or deceptive trade practices. MD. CODE ANN., COM LAW II § 13-303(1) (2000). Plaintiffs assert that 3M executives acted in concert with Donald McGhan and this conduct qualified as conduct prohibited by statute.

However, Plaintiffs do not dispute that 3M did not manufacture or sell their breast implants. This statute does not apply to 3M because the company did not engage in trade or commerce with respect to Plaintiffs. In fact, 3M had divested its breast implants line several years before Plaintiffs received the McGhan III breast implants that allegedly caused their injuries. Thus, Plaintiffs' claims brought pursuant to the Maryland Consumer Protection Act against 3M must fail.

## IV. <u>Conclusion</u>

For the previously discussed reasons, Defendant's motion for summary judgment will be granted.

A separate Order will be entered.

_Deborah K. Chasanow_
DEBORAH K. CHASANOW
United States District Judge